FILED & ENTERED

AUG 22 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY RUST      DEPUTY CLERK

# NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

In re:

LA CASA DE LA RAZA, INC.,

           Debtor.

—————————————————————

LA CASA DE LA RAZA, INC.,

           Plaintiff,

v.

TOMAS COSTELO, ESQ., an Individual;
MLG LEASING, INC., a California
Corporation, et al.,

           Defendants.

—————————————————————

Case. No. 9:16-bk-10331-PC

Adversary No. 9:16-ap-01040-PC

Chapter 11

**MEMORANDUM RE: PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT, TOMAS CASTELO**

Date:   May 3, 2017
Time:   1:30 p.m.
Place:  United States Bankruptcy Court
       Courtroom # 201
       1415 State Street
       Santa Barbara, CA  93101

      At the above captioned date and time, the court considered the motion of Plaintiff, La

Casa De La Raza, Inc. ("La Casa") for a default judgment against the remaining Defendant,

Tomas A. Castelo ("Castelo")[1] in the above referenced adversary proceeding.  Having considered the record[2] and argument of counsel, the court will recommend to the district court that La Casa's Motion be denied and that La Casa's First and Sixth Causes of Action against Castelo, together with La Casa's claim for equitable subordination, be dismissed with prejudice based upon the following findings of fact and conclusions of law made pursuant to F.R.Civ.P. 52(a)(1),[3] as incorporated into FRBP 7052 and applied to adversary proceedings in bankruptcy cases.[4]

## STATEMENT OF FACTS

On February 23, 2016, La Casa filed a voluntary petition in the above referenced case.  In Schedule D, La Casa listed MLG Leasing, Inc. ("MLG") as the holder of a claim in the amount of $500,000 secured by real property at 601 E. Montecito Street, Santa Barbara, CA ("Santa Barbara Property") valued at $3,000,000.  On July 13, 2016, MLG filed Proof of Claim # 3 asserting a secured claim in the amount of $576,075.83 for "[m]oney loaned."  Castelo, a lawyer, is the Chief Executive Officer, Chief Financial Officer, Secretary and sole Director of MLG.

---

[1]  The Defendant's name is "Tomas A. Castelo," although La Casa's complaint refers to him interchangeably as "Tomas Costello," Thomas Costello," and Tomas Castelo."

[2]  The record before the court includes the following:  (1) Motion for Default Judgment: Memorandum of Points and Authorities; Declarations in Support Thereof ("Motion") [Dkt # 88] filed February 28, 2017, consisting of La Casa's motion, memorandum of points and authorities, Declaration of Matthew Clarke ("Clark Decl."), Declaration of Marisela Marquez ("Marquez Decl."), Declaration of Raquel Lopez ("Lopez Decl.") and Exhibits A-F to the Motion; (2) the testimony of Matthew Clark, Marisela Marquez, Raquel Lopez, Michael Gonzalez and Luis Villegas at the hearing on May 3, 2017, and (3) Exhibits A through Z and Exhibits 1 through 6 admitted into evidence at the hearing on May 3, 2017.

[3]  Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330.  "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P.").  "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

[4]  This Memorandum Decision constitutes the bankruptcy court's proposed findings of fact and conclusions of law for purposes of 28 U.S.C. § 157(c)(1).  This Memorandum Decision will be transmitted to the United States District Court for entry of a final order or judgment after de novo review pursuant to 28 U.S.C. § 157(c)(1).

On May 5, 2016, La Casa filed the Complaint against Castelo and MLG in this adversary proceeding alleging six causes of action: (1) a determination of the validity and priority of liens; (2) intentional interference with a prospective economic advantage; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) promissory estoppel; and (6) fraud.[5]  La Casa sought a declaratory judgment, actual and punitive damages, and injunctive relief.  On June 6, 2016, Castelo and MLG each filed an answer to La Casa's Complaint.  La Casa then initiated discovery, but Castelo largely ignored La Casa's discovery requests.  On September 15, 2016, the court ordered Castelo to respond but Castelo did not comply with the order.  On November 3, 2016, the court sanctioned Castelo for violating the court's earlier September 15th order, struck his answer, and entered his default.[6]  On January 12, 2017, La Casa moved to dismiss MLG as a defendant in the adversary proceeding without prejudice.  After notice and a hearing, an order was entered dismissing MLG as a party to the case on February 9, 2017.

On February 28, 2017, La Casa moved ex parte for a default judgment against Castelo on its first and sixth causes of action, as well as a claim of equitable subordination.  By order entered on March 6, 2017, the court denied La Casa's ex parte motion and set the matter for a status conference.  At the status conference on March 23, 2017, the court set the motion for an evidentiary hearing on May 3, 2017.

On May 3, 2017, the court heard the testimony of Matthew Clark, Marisela Marquez, Raquel Lopez, Michael Gonzalez and Luis Villegas and admitted further exhibits into evidence.  At the conclusion of the hearing, the matter was taken under submission.

---

[5]  Complaint of La Casa De La Raza, Inc., For: 1) Determination of Validity and Priority of Liens; (2) Intentional Interference With Prospective Economic Advantage; (3) Breach of Contract; (4) Breach of Covenant of Good Faith and Fair Dealing; (5) Unfair Business Practices; (6) Fraud ("Complaint") [Dkt. # 1] filed May 5, 2016.

[6]  Order on Plaintiff's Motion for an Order: (1) for Sanctions against Defendants Jointly and Severally: (2) Entry of Default of Both Defendants ("Sanctions Order") [Dkt. # 37] entered November 3, 2016.  By order entered on December 8, 2016, the court modified the Sanctions Order to vacate the entry of default against MLG.  On December 21, 2016, MLG and Castelo appealed the Sanctions Order.  The appeal is currently pending before the United States District Court in Case No. 2:16-cv-09437-AB.  There is no stay of the Sanctions Order pending appeal.

## II. <u>DISCUSSION</u>

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  This matter is a non-core proceeding as to Castelo.[7]  Venue is appropriate in this court.  28 U.S.C. § 1409(a).

### 1.  <u>Standard for Default Judgment</u>

"The general rule is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."  <u>Geddes v. United Fin. Group</u>, 559 F.2d 557, 560 (9th Cir. 1977).  But an entry of default "does not automatically entitle a plaintiff to entry of a default judgment, regardless of the fact that generally the effect of entry of a default is to deem allegations admitted."  <u>Beltran v. Wells Fargo Bank (In re Beltran)</u>, 182 B.R. 820, 823 (9th Cir. BAP 1995).  The court is authorized to conduct a hearing on the issue of damages before entering a judgment by default.  F.R.Civ.P. 55(b).  The court also has broad discretion to require that a plaintiff establish the facts necessary to show that a valid claim exists meriting the relief sought against the defaulting party.  <u>See</u> <u>Beltran</u>, 182 B.R. at 824 ("Bankruptcy courts are accordingly provided the discretion to require proof of the facts necessary to determine a valid claim for relief against the defaulting parties.").

### 2.  <u>Sixth Cause of Action – Fraud</u>

Under California law fraud is established upon proof of the following elements: "(1) misrepresentation (false representation,[8] concealment, or nondisclosure); (2) knowledge of

---

[7]  Castelo admits in his answer that this court has jurisdiction of this adversary proceeding, and states that the adversary proceeding is a core proceeding.  Answer of Defendant Tomas Castelo [Dkt. # 6] filed June 6, 2016.  However, La Casa is alleging claims against Castelo that arise under state law.  Castelo is neither a creditor of La Casa nor has he filed a proof of claim or otherwise entered an appearance in La Casa's bankruptcy case.  Moreover, Castelo does not consent to entry of final orders or a final judgment in this adversary proceeding.  <u>See</u> Joint Status Report [Dkt. # 12] filed July 18, 2016.

[8]  "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or 'conduct intended to create and foster a false impression.'"  <u>Nat'l Bank of N. Am. V. Newmark (In re Newmark)</u>, 20 B.R. 842, 854 (Bankr. E.D.N.Y. 1982) (quoting <u>H.C. Prange Co. v. Schnore (In re Schnore)</u>, 13 B.R. 249, 251 (Bankr. W.D. Wis. 1981)).

4

falsity (or scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5)

resulting damage." Hoffman v. 162 North Wolfe LLC, 228 Cal.App.4th 1178, 1185-86 (2014)

(citation omitted).  "[T]o establish a cause of action for fraud a plaintiff must plead and prove in

full, factually and specifically, all of the elements of the cause of action." Conrad v. Bank of

Am., 45 Cal.App.4th 133, 156 (1996).

"A fraud claim based upon the suppression or concealment of a material fact must

involve a defendant who has a legal duty to disclose the fact." Hoffman, 228 Cal.App.4th at

1186.  "'There are four circumstances in which the nondisclosure or concealment may constitute

actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when

the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the

defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes

partial representations but also suppresses material facts." Id. (citations omitted).  "[F]raudulent

intent may be established by circumstantial evidence or by inferences drawn from his or her

course of conduct." Fogel Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 62

(9th Cir. BAP 1999).

In the Complaint's sixth cause of action for fraud, La Casa claims that Castelo made the

following false representations to La Casa upon which it justifiably relied to its detriment:

a.  Mr. Castelo promised he would reinstate the loan so that La Casa was in good
standing.  This would allow La Casa to pursue a loan with the Santa Barbara
Foundation.

b.  Mr. Castelo indicated to La Casa that he could and would help with La Casa's
financial troubles.  He claimed that he had done so before and would do it again.

c.  On Saturday, September 19, 2015, Mr. Castelo indicated that he had helped La Casa
financially on previous occasions and he would do it again.

d.  When questioned about his motives, Mr. Castelo stated that he wanted nothing more
than to assist La Casa financially, because, "I already have enough headaches in my
life."

e.  Mr. Castelo promised that he had no interest in becoming involved in the
management or finances of La Casa.

f.  Mr. Castelo promised that he would not foreclose on the La Casa property and that a provision allowing him to do so was leftover from another version of the agreement. "It is not my intention to continue with the foreclosure action . . . ."

g.  Mr. Castelo promised to provide a bridge loan. "This will become a 'Bridge Loan' transaction, a common practice utilized to avoid the expiration of third party time constraints imposed upon the parties."

h.  "[La Casa is] being afforded the opportunity to pursue meaningful solutions, on a fair and reasonable timetable . . . ."

i.  "I am in the process of downsizing my holdings and have little interest in adding another burden to my holdings and a foreclosure sale is at the bottom of my list of options. You may conduct yourselves accordingly."[9]

According to the evidence, La Casa executed a promissory note in the original principal sum of $440,000, payable to Nelson Shrager or Steve Shrager, as Trustees FBO the Budget Industrial Uniform Supply, Inc. Profit Sharing Plan, et al., dated June 6, 2012 ("Fidelity Note"), which was serviced by Fidelity Mortgage Lenders, Inc. ("Fidelity"). The Fidelity Note was secured by a Deed of Trust of even date therewith encumbering the Santa Barbara Property ("Deed of Trust"). When La Casa defaulted under the Fidelity Note, a notice of default was recorded followed by a notice that the Santa Barbara Property would be sold under the Deed of Trust at a foreclosure sale. La Casa retained Matthew Clarke ("Clarke"), an attorney, to assist it in obtaining three forbearance agreements to postpone of the foreclosure sale while it attempted to secure funds necessary to either pay off the loan entirely or bring the loan current.

When the third forbearance agreement expired, Clarke obtained a temporary restraining order to postpone the sale set for September 28, 2015, but was unsuccessful in securing a temporary injunction to halt Fidelity's efforts to foreclose its deed of trust lien on the Santa Barbara Property. On September 16, 2015, Fidelity provided La Casa with a letter entitled "Beneficiary's Demand for Payoff" which disclosed that the balance due and owning on the Fidelity Note as of September 25, 2015, was $522,314.28, which included $417,790.71 in principal, accrued interest of $20,953.52 from March 15, 2015 to September 25, 2015, and $83,570.05 in accrued late charges, unpaid charges and other fees.

---

[9] Complaint, 21:1-24.

At the hearing on May 3, 2017, Michael Gonzales, La Casa's current President, testified that he has known Castelo since 1971; that Castelo was La Casa's first executive director; and that Castelo has been, and continues to be, an attorney for La Casa.  Clarke testified that while the foreclosure was pending, Castelo contacted Wayne S. Grajewski, attorney for Fidelity, and Marisela Marquez ("Marquez"), who was La Casa's President at the time of the foreclosure, regarding the status of the Fidelity Note.

In his declaration dated February 27, 2017, Clarke testified that on September 19, 2015, Castelo offered to "reinstate the loan so that La Casa would be in good standing so it could get a loan from The Santa Barbara Foundation."  When asked by Clarke why he was offering to help, Castelo responded that "he wanted nothing more than to assist La Casa financially, because, 'I already have enough headaches in my life.'"  Clarke further testified by declaration that:

> 5. Mr. Castelo told me that La Casa would have to submit to him financial records and he would provide a Commercial Loan Commitment Letter.  Mr. Castelo to [sic] me by email a sample Commercial Loan Commitment Letter to La Casa to illustrate what he was willing to do.  Mr. Castelo also requested documents reflecting the current loan, billing statements and La Casa financial statements.  La Casa, through me, provided the information to Mr. Castelo on September 21, 2015, at 10:55 a.m.

> 6. Pursuant to Mr. Castelo's request, La Casa submit the Commercial Loan Commitment Letter, through me, to Mr. Castelo on September 21, 2015, at 1:46 p.m. reflecting a loan of $125,000, which was sufficient to reinstate the Fidelity loan.  Mr. Castel [sic] told me on September 21, 2015, at 2:04 p.m., that "I have received and downloaded 29 files from your link – I will not have time to review these documents nor your proposed loan commitment letter until sometime tomorrow due to deadlines for work commitments for some of my other clients."

> 7. On September 22, 2015, I told Mr. Castelo that a foreclosure sale was scheduled for September 28, 2015.  Mr. Castelo asked me that he be placed in contact with the lender via conference call with La Casa.  La Casa introduced Mr. Castelo, as their attorney, to Wayne Grajewski, an attorney who represented Fidelity.  I know that Mr. Castelo contacted Mr. Grajewski by telephone, presumably to begin negotiations on behalf of his client, La Casa.

> 8. On September 22, 2015, at 4:42 p.m., Mr. Castelo wrote to Mr. Grajewski and copied me, stating . . . "I am prepared to wire $523K tomorrow morning if we can get your timely approvals."

9. On September 22, 2015, at 8:12 p.m., Mr. Castelo set a draft Loan Sale agreement and draft Assumption of Deed to me, on behalf of La Casa and Mr. Grajewski.  I was pleased because I believed that Mr. Castelo was fulfilling his promise to assist La Casa financially by purchasing the loan from Fidelity.

10. On September 23, 2015, after I reviewed the proposed loan purchase agreement and agreement transferring the deed of trust from Fidelity to Mr. Castelo, I commented to Mr. Castelo: "There is a provision in paragraph 10.6 which indicates the Buyer requests that the foreclosure continue and the rights to foreclosure are transferred to the Buyer.  Are you intending to foreclose on the property?  If so, notify me immediately.  My understanding is that you agreed to loan money to Casa de la Raza rather than purchase the loan and foreclose on the property."

11. Mr. Castelo responded to me as follows on September 23, 2015, at 11:47 a.m.: "It is my opinion that, with a 48-hour time fuse, there is not sufficient time allowed to explore the alternative options and formalities that may be required of us at this time.  I should have been brought into this much sooner and have responded as promptly as I could!. [sic] Rather than negotiate these same provisions from scratch, I have dusted off the same documents the [sic] we used for the 2010 transaction with SBB&T.  These docs were drafted by the Bank's Attorney and contain all the conventional provisions utilized by the bank for these types of transactions.  I did not enforce the foreclosure clause then, notwithstanding the fact that the borrower never made any monthly payments, and do not expect it to become a factor at this time if the Board makes a diligent and good faith effort to implement their stated long term plans.  It is not my intention to continue with the foreclosure action but by substituting myself for the Lender, we can now control the flow of this transaction and the Board will have ample opportunity to make good on their representations regarding the pending new foundation loan within the next 60 days (or so), in which case this will become a "Bridge Loan" transaction, a common practice utilized to avoid the expiration of third party time constraints imposed upon the parties.  Most experienced investors familiar with the proceedings will share my opinion that it is not to anyone's advantage to allow a foreclosure to take place.

12. I understood Mr. Castelo's statement to mean (a) He did not intend to foreclose; (b) he intended to provide a bridge loan; (c) the provision in the agreement maintaining the foreclosure sale was a "leftover" from a prior version of the agreement and did not apply to this transaction, and (d) that Castelo was advising them as to the meaning of the content within the loan documents as their attorney.

13. On September 25, 2015, Fidelity confirmed payment by Mr. Castelo, in an email to me, as follows: "This morning, Fidelity received the full pay-off amount from a wire initiated by Tomas [Castelo].  Accordingly, we are moving our foreclosure sale date from this Monday until next Friday, October 2.  Because

Tomas will now own the Note and the Deed of Trust, it will be his decision as to what he wants to do with the new foreclosure date." . . .

16. On September 25, 2015, at 5:10 p.m. Mr. Castelo began making threats of foreclosure to me, as La Casa's agent, if La Casa did not act as he saw fit.  He also refused to reinstate the loan as promised.  Instead Mr. Castelo made amorphous, undefined demands that the Board display "competence." . . .

27. Based on what he said, we believed Mr. Castelo that he did not intend to foreclose on the property.  La Casa worked diligently (as it had done for months) to secure the loan with Santa Barbara Foundation.

28. On October 21, 2015, La Casa's full board of directors met with Mr. Castelo.  I appeared by telephone and my associate attorney, Matthew Mong appeared in person.  Mr. Castelo appeared at the meeting with attorney Tony Fischer.  Mr. Castelo confirmed that he would provide a bridge loan and that La Casa did not have to make monthly payments during the interim.

29. On November 5, 2015, Mr. Castelo informed me on behalf of La Casa that the foreclosure was delayed until November 25, 2015.  It was on this same day that I was informed that the note had been transferred to Mr. Castelo's alter ego, MLG Leasing, Inc.[10]

30. MLG Leasing, Inc., at the same time, imposed various terms on La Casa that were not in the [Fidelity] Note.  For example, MLG Leasing required that La Casa pass over a number of hurdles "to avoid foreclosure" and demonstrate "financial maturity" and solvency.

31. On behalf of La Casa, I responded to Mr. Castelo and MLG Leasing as follows: "La Casa is confused about the rationale and authorization in the loan documents to simultaneously require La Casa: (a) to make regular monthly payments under the loan; (b) to pay roughly $120,000 in charges on November 24, 2015, and (c) to maintain a foreclosure of the property on November 25, 2015.  Can you please explain to La Casa the provisions in the loan documents which allow you to do this?"

32. Mr. Castelo responded on November 25, 2015, "Any person could have purchased the note and they 'don't need no stinking permission' from the borrower or any else!  Had I not taken swift and decisive action, La Casa would

---

[10]  MLG was incorporated under the laws of the State of California on May 12, 1988.  According to the Statement of Information filed with the Secretary of State of California on August 28, 2015, Castelo is the Chief Executive Officer, Chief Financial Officer, Secretary, Sole Director, and Agent for Service of MLG.  The business of MLG is described in paragraph 19 of the Statement of Information as "Leasing of Business Equipment and Fixtures."  Plaintiff's Exhibit A.

be dealing with the buildings new titleholders by now and the ultimate big winners would be the respective attorneys.  Meanwhile, the default terms and conditions of the [Fidelity] Note and Deed of Trust remain in full force and effect and I have instructed the Foreclosure Agent to continue the postponement of today's scheduled sale.  I would like us to continue to move forward with our plan for the Corporate Board to submit the customary financial application forms required for a commercial loan to our selected prospective lenders and continue to have our Advisory Committee (Luis, Raul, Mike et al) formulate a 'work-out' plan that will provide a long-term resolution to the current financial morass.  I will be leaving town soon and will be out of State, hoping to return sometime around December 6, 2015.  You may all conduct yourselves accordingly."

33. On November 30, 2015, MLG Leasing's trustee executed a postponement of the foreclosure sale to January 27, 2016.

34. On January 9, 2016, I informed Mr. Castelo that La Casa was processing a loan application with Montecito Bank & Trust and the loan would be guaranteed by the Santa Barbara Foundation. . . .

35. Mr. Castelo responded to me two days later on January 11, 2015, that his attorneys would have to deal with whether to grant any further delay in the foreclosure.

36. Mr. Castelo's attorney, Tony Fischer, responded to me ten days later stating that any delay of the foreclosure would be conditioned upon a meeting with the potential lenders (Santa Barbara Foundation and Montecito Bank & Trust) and answers to his various questions about the status of the Santa Barbara/Montecito Bank & Trust loan.

37. After providing the information requested, La Casa requested that Mr. Castelo and MLG Leasing confirm no foreclosure would take place.  Mr. Fischer, on behalf of Mr. Castelo and MLG Leasing, refused to do so.  He communicated this to me.

38. The foreclosure sale was scheduled to occur on January 27, 2016, at 1:00 p.m. at 1100 Anacapa Street, Santa Barbara, California 93101.

39. On January 25, 2016, in response to the looming foreclosure, I filed a civil suit (Case No. 16CV00266) against Tomas Castelo and MLG Leasing, Inc. along with a motion for a temporary restraining order and preliminary injunction in the Santa Barbara Superior Court.

40. The preliminary injunction came up for hearing on February 10, 2016, and was subsequently denied . . . .[11]

---

[11]  Clarke Decl., 1:23-10:2 (emphasis added).

Clark's declaration is consistent with his testimony at the hearing on May 3, 2017.

In her declaration dated February 27, 2017, Marquez testified that (1) "I formally served as a board member and President of La Casa De La Raza, Inc. for 15 years leading up to and including when we sought out Tomas Castelo to assist us with the pending foreclosure from Fidelity;" (2) "Tomas Castelo was a co-founder of La Casa De La Raza, Inc. over forty years ago;" (3) "around September of 2015, we were facing foreclosure by Fidelity Mortgage Lenders and sought out help from Mr. Castelo to provide us with a bridge loan to avoid foreclosure while we sought favorable refinancing through the Santa Barbara Foundation;" (4) "Tomas Castelo never informed me, nor the members of the board that he was purchasing the mortgage note on the property;" (5) "the board never gave Mr. Castelo written consent to purchase the organization's mortgage;" (6) "Mr. Castelo never advised us to seek the opinion of another lawyer before he bought our mortgage;" (7) "we in the organization would routinely seek out Mr. Castelo's opinion when legal or financial disputes arose;" and (8) I always considered Mr. Castelo to be an attorney acting on behalf of La Casa when these problems did arise."[12]

Raquel Lopez, La Casa's current Executive Director, testified by declaration dated February 27, 2017, that (1) Castelo "was a co-founder of [La Casa] over forty years ago;" (2) she "always considered Mr. Castelo to be an attorney acting on behalf of La Casa when these problems did arise;" and (3) "[t]hat Tomas Castelo never informed our staff nor board members of La Casa that he was purchasing the mortgage on our property in writing until after he had completed the purchase."[13]  The declarations of Clarke, Marquez and Lopez are consistent with their testimony at the hearing on May 3, 2017.

La Casa has not alleged in the Motion or its Complaint that Castelo concealed or failed to disclose material facts concerning the purchase of the Fidelity Note and Deed of Trust or the transfer of the Fidelity Note and Deed of Trust to MLG.  La Casa asserts in its Motion that "Castelo defrauded [La Casa] by purchasing the note from Fidelity and then continuing to

---

[12] Marquez Decl., 1:7-20.

[13] Lopez Decl., 1:6-18.

foreclose on their property instead of providing the bridge loan as initially promised."[14] Specifically, La Casa claims that Castelo falsely represented "that he would provide [La Casa] with a bridge loan."[15]  La Casa further claims that Castelo falsely represented that "the provisions of the purchase relating to keeping [La Casa] in default was merely leftover language from the last agreement he drafted."[16]  The weight of the evidence, however, does not support a finding that either representation satisfies the five-prong test for fraud.

La Casa was delinquent in its payment of the Fidelity Note and Fidelity had scheduled a foreclosure sale of the Santa Barbara Property under the Deed of Trust.  La Casa did not have the funds to bring the loan current nor did it have a commitment from a third party lender to refinance the loan. By letter dated September 8, 2015, Clarke had asked the Santa Barbara Foundation for "a loan with a reasonable interest rate to 'take out' the [Fidelity Note]."[17]  By letter dated September 15, 2015, the Santa Barbara Foundation had expressed a desire to assist La Casa with a loan to refinance the Fidelity Note, but it intended "to take the matter up in October and have a recommendation to the Board of Trustees at its November 12, 2015 meeting."[18]  That was too late and La Casa had run out of options.

Castelo agreed to assist La Casa with the Fidelity Note.  Castelo did not falsely represent to La Casa that he would provide La Casa with a bridge loan.  Clarke, who represented La Casa in the negotiations with Fidelity and Castelo regarding the Fidelity Note, understood as early as September 22, 2015, that Castelo intended to purchase the Fidelity Note rather than provide a separate loan to La Casa to bring the Fidelity Note current prior to the scheduled foreclosure sale.  Clarke testified by declaration he received a draft Loan Sale Agreement and a draft Assumption of Deed on the morning of September 22, 2015, and "was pleased because [he]

---

[14]  Motion, 26:15-18.

[15]  Id. at 26:25.

[16]  Id. at 26:27-28.

[17]  Trial Exhibit Z.

[18]  Trial Exhibit Y.

believed that Mr. Castelo was fulfilling his promise to assist La Casa financially by purchasing the loan from Fidelity."[19]

Clarke's primary concern was not whether Castelo's purchase of the Fidelity Note was a true "bridge loan," but whether Castelo intended to continue with the foreclosure sale once he was assigned the delinquent Fidelity Note and Deed of Trust on the Santa Barbara Property. By email dated September 23, 2015, Clarke asked Castelo about his intentions with respect to paragraph 10.6 of the Loan Sale Agreement and whether he intended to foreclose on the Santa Barbara Property. That same day, Castelo responded by email. Castelo acknowledged that the draft Loan Sale Agreement, which he said was adapted from a prior loan transaction, contained a provision permitting him to continue the foreclosure, but stated:

> I did not enforce the foreclosure action then, notwithstanding the fact that the borrower never made any monthly payments, and do not expect it to become a factor at this time <u>if the Board makes a diligent and good faith effort to implement their stated long term plans</u>.
>
> It is not my intention to continue with the foreclosure action but by simply substituting myself for the Lender, we can now control the flow of this transaction and the Board will have ample opportunity to make good on their representations regarding the pending new foundation loan <u>within the next 60 days (or so)</u>, in which case this will become a "Bridge Loan" transaction, a common practice utilized to avoid the expiration of third party time constraints imposed by parties.[20]

Castelo did represent that "the provisions of the purchase relating to keeping [La Casa] in default was merely leftover language from the last agreement he drafted." However, there is no credible evidence that Castelo's statement was false, that he knew it was false when he made the statement, or that he made the statement with the intent to deceive Clarke and his client, La Casa. Moreover, notwithstanding Castelo's stated intent to purchase the delinquent Fidelity Note, Clarke acknowledged by email on September 23, 2015, that he and La Casa also viewed the

---

[19] Clark Decl. 2:21-22.

[20] Trial Exhibit S (emphasis added); <u>see</u> Clarke Decl., 3:7-17..

transaction as a bridge loan and stated that he was "extremely pleased you are willing to purchase the Fidelity loan and move forward as Casa's interim lender."[21]

The court disagrees with La Casa's claim that Castelo's "tone changed completely" as soon as the Fidelity Note was transferred to MLG, and that he "opted to enforce those very terms by way of continuing to keep La Casa in default and in foreclosure."[22]  Castelo agreed to purchase the Fidelity Note to prevent immediate foreclosure by Fidelity on September 28, 2015, but it is apparent that he had no intention of becoming a permanent lender for La Casa.  Principal and interest continued to accrue on the Fidelity Note after it was purchased by Castelo.  Castelo had a right to immediately foreclose but he refrained from doing so.

By letter dated November 5, 2015, La Casa was advised that the Fidelity Note and Deed of Trust had been assigned to MLG.[23]  By separate letter dated November 15, 2015, MLG advised La Casa that it would "consider a request to continue the foreclosure for a reasonable period, not to exceed 60 days, to permit La Casa to continue its use of the premises uninterrupted and to permit the parties to negotiate a long-term solution" so long as La Casa (1) commenced the regular monthly payments of $4,101.38 due under the Fidelity Note; (2) "[made] a diligent and good faith effort to obtain a temporary 'bridge loan'" in the amount of $126,208.54, plus daily accruals, and (3) "[made] a diligent and good faith effort to obtain replacement financing."[24]

Castelo postponed a foreclosure sale for nearly four months.  During such period, La Casa was unable to secure a commitment for either (1) a permanent loan to refinance the Fidelity Note or (2) the temporary "bridge loan" referenced in the November 15th letter pending a permanent refinance of the Fidelity Note.  There is no evidence that La Casa commenced the

---

[21]  Trial Exhibit S.

[22]  Motion, 28:19-22.

[23]  Trial Exhibit M.

[24]  Trial Exhibit N (emphasis added).

regular monthly payments of $4,101.38 due under the Fidelity Note to MLG, as requested in the

November 15th letter.  Ultimately, MLG elected to proceed with a foreclosure sale on January

27, 2016.  La Casa sought a preliminary injunction in state court to prevent MLG from

foreclosing on the Santa Barbara Property, but its inability to obtain injunctive relief prompted

the filing of La Casa's chapter 11 petition on February 23, 2016, to halt the continued foreclosure

sale.

   Finally, La Casa claims that Castelo was its attorney and, as its attorney, violated Rule 3-

300 of the California Rules of Professional Conduct in purchasing the Fidelity Note and Deed of

Trust by not securing La Casa's written consent to the transaction after (1) providing La Casa

with written notice of his intention to purchase the Fidelity Note and Deed of Trust, and (2) an

opportunity to seek the advice of independent counsel.  Rule 3-300 of the California Rules of

Professional Conduct states that "[a] member shall not enter into a business transaction with a

client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest

adverse to a client, unless each of the following requirements has been satisfied:

  (A) The transaction or acquisition and its terms are fair and reasonable to the
    client and are fully disclosed and transmitted in writing to the client in a
    manner which should reasonably have been understood by the client; and

  (B) The client is advised in writing that the client may seek the advice of an
    independent lawyer of the client's choice and is given a reasonable
    opportunity to seek that advice; and

  (C) The client thereafter consents in writing to the terms of the transaction or the
    terms of the acquisition.

Rule 3-300 is triggered when "an attorney who obtains an interest in the property of a client,

where it is reasonably foreseeable that his acquisition may become detrimental to the client, even

though his intention is to aid the client, has acquired an interest adverse to the client."  Connor v.

State Bar of Ca., 50 Cal.3d 1047, 1057 (1990); see Ames v. State Bar of Ca., 8 Cal.3d 910, 918

(1973) ("We think it is clear that petitioners' purchase of the note and first deed of trust

constituted an acquisition of an interest adverse to their clients.").

"A violation of the Rules of Professional Conduct subjects an attorney to disciplinary proceedings, but does not in itself provide a basis for civil liability." <u>BGJ Assocs., LLC v. Wilson</u>, 113 Cal.App.4th 1217, 1227 (2003); <u>see</u> <u>Prakashpalan v. Engstrom, Lipscomb & Lack</u>, 223 Cal.App.4th 1105, 1128 (2014) ("[A] 'violation of the Rules of Professional Conduct does not, in and of itself, render an attorney liable for damages.'" (citation omitted)).

By virtue of his relationship with La Casa, Castelo unquestionably had a legal duty to disclose material facts. La Casa has not, however, alleged that Castelo concealed or failed to disclose material facts concerning the acquisition and enforcement of the Fidelity Note and Deed of Trust. La Casa's Motion is predicated upon two false representations allegedly made by Castelo to La Casa. The court is unable to find that either representation was false; or if false, that Castelo made the false representation to La Casa with knowledge of its falsity, with the intent to deceive La Casa, and to induce it to justifiably rely on the statement to its detriment. Nor does the evidence permit an inference of fraudulent intent from Castelo's course of conduct.

Even if the court were to find fraud, La Casa has failed to produce evidence that it sustained any actual damages proximately caused by such statements. "The measure of damages in a fraud action is 'out of pocket' loss." <u>Kukulka-Stone v. Ekrem (In re Ekrem)</u>, 192 B.R. 982, 997 (Bankr. C.D. Cal. 1996). "[T]he defrauded party may also recover reasonable amounts that were expended because of the deceit." <u>Id.</u> La Casa acknowledges in its Motion that, notwithstanding entry of default, "the moving party must still establish the amount of damages."[25] La Casa's Motion, however, does not identify any actual damages proximately caused by the alleged fraud. La Casa simply states that it "should be awarded punitive damages not less than $600,000.00 which is the approximate value of the note purchased."[26]

Clarke testified at the hearing that La Casa lost the opportunity to negotiate the reduction of accrued late fees and other unpaid charges in excess of $80,000 when Castelo purchased the

---

[25] Motion, 30:25-26.

[26] <u>Id.</u> at 31:9-11. La Casa's prayer in the Motion seeks a judgment "for fraud in the amount of no less than $600,000.00 in punitive damages" without claiming any amount of actual or compensatory damages. <u>Id.</u> at 33:10.

Fidelity Note rather than loaning La Casa an amount sufficient to bring the loan current.  But Clarke's testimony on this issue conflicts with his own emails in which stated that he was "extremely pleased" that Castelo was purchasing the Fidelity Note.  More importantly, La Casa's actual damage in this regard is speculative because there is no evidence that La Casa had any agreement with Fidelity to reduce or waive such charges if the Fidelity Note was brought current or that it had even negotiated the point with Fidelity prior to Fidelity's scheduled foreclosure sale.

La Casa also claims that Castelo's "actions resulted in a state court action to prevent foreclosure and eventually bankruptcy related to this adversary proceeding forcing [La Casa] to incur significant legal fees."[27]  La Casa did not plead an amount of attorneys' fees and costs actually incurred by La Casa for the period between assignment of the Fidelity Note and Deed of Trust to MLG and La Casa's bankruptcy attributable to Castelo's alleged fraud.  The evidence of such attorneys' fees is also insufficient.

At the hearing Clarke testified that he rendered 100 hours of legal services to La Casa, billed at a rate of $250.00 per hour, for a total cost of $25,000 defending a foreclosure under the Fidelity Note from the time Castelo became involved until September 2016.  Fidelity's scheduled foreclosure under the Fidelity Note was September 28, 2015, MLG acquired the Fidelity Note in November 2015, and La Casa filed its chapter 11 petition on February 23, 2016.  Clarke did not bifurcate and identify the time spent or services rendered to La Casa for the period between September 28, 2015 and February 23, 2016.  To recover for legal services rendered after February 23, 2016, Clarke would have had to have been employed as counsel for La Casa, as debtor in possession, pursuant to § 327.  Because his employment was not approved by the court, Clarke is not qualified to recover attorneys' fees for legal services rendered to La Casa after February 23, 2016.  Absent evidence of La Casa's attorneys' fees incurred between September 28, 2015 and February 23, 2016, proximately caused by Castelo's alleged fraud, the court is unable to make any finding regarding actual damages to La Casa attributable to attorneys' fees.

---

[27] Motion, 26:21-24.

"In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilt of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal.Civ.Code § 3294(a). "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Id. at § 3294(c)(2). "California courts have long interpreted Section 3294 to require an award of compensatory damages, even if nominal, to recover punitive damages." California v. Altus Fin. S.A., 540 F.3d 992, 1000 (9th Cir. 2008). La Casa is not entitled to an award of punitive damages because it has not established a fraud nor actual damages attributable thereto.

Based on the foregoing, La Casa's motion for a default judgment on its sixth cause of action should be denied.

3.  First Cause of Action – To Determine Validity and Priority of Liens

In paragraph 60 of its Complaint, La Casa alleges that "[o]n or about September 23, 2016, [Castelo] through his alter ego MLG Leasing, Inc., violated Rule 3-300 of the California Rules of Professional Conduct by taking an adverse interest to his client La Casa De La Raza, Inc. by purchasing the note from Fidelity."[28] La Casa claims that the Deed of Trust securing the Fidelity Note acquired by Castelo should be set aside because Castelo, as La Casa's attorney, did not make the disclosures to La Casa required by Rule 3-300 before purchasing the Fidelity Note. Specifically, Castelo did not properly inform La Casa's board of directors of his intention to purchase the Fidelity Note in its entirety, give La Casa's board of directors a reasonable opportunity to seek independent legal advice regarding the transaction, nor obtain the written consent of La Casa's board of directors before consummating the transaction.

As previously stated, "[a] violation of the Rules of Professional Conduct subjects an attorney to disciplinary proceedings, but does not in itself provide a basis for civil liability." BGJ Assocs., LLC v. Wilson, 113 Cal.App.4th 1217, 1227 (2003); see Prakashpalan v.

---

[28] Complaint, 15:19-21.

Engstrom, Lipscomb & Lack, 223 Cal.App.4th 1105, 1128 (2014) ("[A] 'violation of the Rules of Professional Conduct does not, in and of itself, render an attorney liable for damages.'" (citation omitted)).

More importantly, MLG is the beneficiary under the Deed of Trust, not Castelo.  Two requirements are necessary to invoke the alter ego doctrine: "'(1) that there be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.'" Mesler v. Bragg Mgm't Co., 39 Cal.3d 290, 300 (1985) (quoting Automotriz del Golfo de Ca. v. Resnick, 47 Cal.2d 792, 796 (1957)).  "Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." Walsh v. Kindred Healthcare, 798 F.Supp.2d 1073, 1082 (N.D. Cal. 2011) (citing Roman Catholic Archbishop v. Superior Court, 15 Cal.App.3d 405, 411 (1971)).

To set aside the Deed of Trust, La Casa has the burden to establish by a preponderance of the evidence that (1) MLG is the alter ego of Castelo given the unity of interest and ownership; (2) that MLG participated with Castelo in a fraudulent scheme to acquire the Fidelity Note and Deed of Trust; and (3) that piercing MLG's corporate veil to set aside the Deed of Trust, in whole or in part, is justified to avoid an inequitable result.

In an action to pierce the corporate veil under an alter ego theory, the corporation is a necessary party to the litigation under Rule 19(a)(1). See Bekins v. Zhelznyak, 2016 WL 126729, *4 (C.D. Cal. 2016); Wilson Metals USA, Inc., 2012 WL 5932990, *5 (E.D. Cal. 2012). Moreover, "California law requires a quiet title plaintiff to name as defendants those persons 'having adverse claims to the title of the plaintiff against which a determination is sought.'" Mortg. Elec. Registration Sys. v. Robinson, 45 F.Supp.3d 1207, 1210 (C.D. Cal. 2014) (quoting Cal.Civ.Proc. Code § 762.010).  "'Claim' includes a legal or equitable right, title, estate, lien, or interest in property or cloud upon title."  Cal.Civ.Proc. Code § 760.010(a).  MLG is a necessary

party to any action challenging its corporate existence or seeking to declare void an interest that it owns in real property.

Based on the evidence presented, La Casa is not entitled to a default judgment on its first cause of action because (1) it has failed to establish that Castelo committed fraud in the acquisition and enforcement of the Fidelity Note and Deed of Trust, and (2) MLG is no longer a party to this adversary proceeding. Accordingly, La Casa's motion for a default judgment on its first cause of action should be denied.

4. <u>Equitable Subordination</u>

La Casa did not plead a claim for equitable subordination in its complaint. As a result La Casa is not entitled to equitable subordination by default judgment. <u>See</u> F.R.Civ.P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

CONCLUSION

In sum, this court will recommend to the district court that La Casa's Motion be denied and that La Casa's First and Sixth Causes of Action against Castelo, together with its claim for equitable subordination, be dismissed with prejudice.

###

Date: August 22, 2017

Peter H. Carroll
United States Bankruptcy Judge